We have four cases this morning. The first is 21-1880, Ute Tribe, Ute Indian Tribe v. United States. Mr. Holditch, go ahead. Good morning, Your Honors, and may it please the Court. My name is Michael Holditch. I am arguing this morning on behalf of the appellant, the Ute Indian Tribe. There are three issues from the lower court that are up on appeal, Your Honors. Tracking the analysis of the lower court, I'm going to be dedicating much of my time this morning on what is arguably the most far-reaching issue as it pertains to the underlying action, which is the lower court's finding that the tribe had failed to show any source of federal law establishing fiduciary obligations as to the tribe's water rights or water infrastructure that were enforceable in the Court of Federal Claims and Monetary Damages. That would seem to encompass two separate issues. One is whether there is some sort of trust obligation with respect to securing future water rights. And the second issue is whether there is a trust obligation in managing the water rights and infrastructure that is part of the alleged trust, right? That's correct, Your Honor. There are separate but related trust duties that relate to or pertain to the security and protection of the tribe's Indian reserved water rights, which are present perfected property rights that are beneficially owned by the tribe. Those are the water rights that were affirmed in the Winters Doctrine, which is the 1908 Supreme Court opinion that affirmed that when an Indian reservation is created, by implication, the quantity of water rights, even if they're silent as to the issue of water rights, that that reservation also reserved a quantity of water necessary to sustain the purpose of the reservation, which is, in the case of an Indian reservation, a permanent and sustainable homeland. Now, there's also the separate but related issue of infrastructure. This is a specifically strong case for the Indian trust responsibility as a money mandating duty as it pertains to water for that very purpose. Why don't you take one example and give us one example of something that has rights creating or imposes a duty on the government on behalf of the tribes? Would you be requesting an example specific to this case or an example that's... An example in this case, yeah. An example would be the Act of 1899. The reason why that act establishes money mandating fiduciary duty is because it meets the standard. The standard for that was articulated in the 1983 U.S. Supreme Court opinion in Mitchell II and its progeny. But you have a problem with the recent Supreme Court decision in Navajo. Now, as I understand, we're just talking here about the first subpart of this. That is the supposed obligation to secure additional water for the tribe, which you say is under the Windrush doctrine. But doesn't the Navajo case preclude that argument? Thank you for that question, Your Honor, because I think that's very important to this case. And I'll say that the lower court did not, of course, have the benefit of that Navajo court analysis, which was, I believe, came out in June of 2023. Now, had it had the benefit of that analysis, I do think that the outcome of this case may have been different. Because although the Supreme Court ruled against the Navajo Nation in that case, consistent with Mitchell II and also the 2003 Supreme Court case, White Mountain Apache, U.S. versus White Mountain Apache, the Supreme Court found that the treaties that were cited by the Navajo Nation fell short. And the reason they fell short was because they did not pertain to or speak to a trust asset of tribal water. They were essentially silent on the issue of tribal water being a trust asset or part of a trust corpus, if you look at it in terms of a conventional fiduciary relationship. In fact, if you looked at Justice Kavanaugh's majority opinion, he specifically says, unless Congress has created a conventional trust relationship with the tribe as to a particular trust asset, here referring to the tribal water rights, this court will not apply common law trust principles to infer duties in the text of a treaty statute or regulation. So this is something the Navajo Nation was not able to provide, but it's precisely what makes the Ute Indian Tribes case distinguishable from the Navajo Nation's case, because it has this 1899, as it pertains to the water rights themselves, 1899 Act of Congress that affirmatively confers upon the United States a duty to secure and protect water rights on behalf of the tribe, tribal water rights that are pertinent to the reservation. The language to that says, and it shall be the duty of the Secretary of Interior to prescribe such rules and regulations as he may deem necessary. It seems like there's some discretion that was built into that. Does that affect the strength or the weight of the obligation that you're talking about? It would be the tribe's position that to the extent that discretionary component of the 1899 Act impacts the strength of the existence of a money mandating fiduciary duty, it actually bolsters the strength because it is giving the Secretary some discretion that is couched within a duty to act a certain way. The Congress is conferring upon the Secretary essentially an obligation to decide how this needs to be done. What needs to be done? The security and protection of the tribe's water rights, not only for their present needs, but also for their future and prospective needs. I think that interpretation is supported by the language of the Act, first and foremost, because it doesn't say what water right has been appropriated or will be appropriated for specific needs, but it refers to the present and future wants of the tribe. That's a subjective standard, and I don't think that the Congress intended for the Secretary to be in charge of deciding what the tribe wants or doesn't want. Let's assume hypothetically that we reject that argument. We say that your first claim with respect to securing future water for the tribe, the winters obligation, argument is foreclosed by Navajo. What about the second issue about the government's trust obligation with respect to the existing infrastructure and its obligation to manage that infrastructure in accordance with trust principles? That's part of your claim, right? Yes. Yes, Your Honor. I would point the Court, first and foremost, to the 1906 Act that authorized the construction of what's known as the Uinta Indian Irrigation Project. The language of that Act is very telling. It confers upon the Secretary the authority to construct and operate this irrigation project, but further still, it specifically and expressly states that this irrigation project will be held in trust for the benefit of the Indian beneficiaries of that project, and not only that, but that the Secretary may sue and be sued in relation to that trust responsibility. Why is that significant, that language? I noticed that in your brief, that he may sue or be sued, it matters. Does that suggest, does that further cement that there was a trust relationship established? Yes, Your Honor, and the reason for that is because under a traditional Tucker Act analysis, and the Tucker Act is the statute under which there's a waiver of sovereign immunity on the part of the United States to be sued for money damages, but the jurisprudence has been quite clear that the Tucker Act does not independently establish a cause of action to be sued. It's one piece of a two-piece puzzle. Traditionally, for a breach of trust action, you could point to the Tucker Act and say, there's your waiver of sovereign immunity for the United States, but then we have to look to these trust principles, and whether there's a statute that prescribes a duty or right that bears the hallmarks of a conventional fiduciary relationship. In this case, I think that really this is resolved without going into an in-depth analysis, as to the Mitchell II standard for establishing a money-mandating fiduciary duty, because it identifies the trust status of the asset and specifically gives the beneficiaries an avenue to sue the secretary in relation to the trust status of that asset. So it's really self-contained within the language. What do you understand the government's argument to be as to how this is different from the White Mountain Apache? I'm sorry, Your Honor? What do you understand the government's argument to be as to how this is different from White Mountain Apache? What I understand the government's argument to be is that in White Mountain Apache, the 1960 Act of Congress that was in question, it identified the trust asset, in that case it was a former military post, to be a trust asset that was to be held in trust for the benefit of the tribe, and also gave the secretary authority to utilize that trust property for certain purposes at their discretion. And so what the government's argued is that that second component was really the germane and salient issue there, but my counter-argument to that would be that the issue of control is not necessarily couched within the language of the statute itself. It can be pertinent, and this was spelled out very clearly in the White Mountain Apache case, that the degree to which the United States actually exercises its authority to control, occupy, or use the trust asset is also relevant to the inquiry of whether there's a sufficient level of control over the asset to give rise to money-mandating duties. And so what the government's arguing is that because the 1906 Act doesn't specifically say that the secretary or the Department of Interior has a specific right to occupy this trust asset, then that's what makes it distinguishable from White Mountain Apache, when the truth is the United States has, in fact, exercised its authority as the title owner of this asset. It has exercised pervasive, elaborate, and exclusive control over the Uinta Indian Irrigation Project from the time of its inception to now. And so I think that it is, in fact, analogous to White Mountain Apache. Can I ask you just your claim regarding the Midview Exchange Agreement? I think it's a breach claim. Why is that not time-barred? Oh, yes, Your Honor. That's not time-barred because of application of the Stabilization Doctrine. Have we ever applied that in this type of context? I thought that was for the impact of flooding, maybe. Well, it's not been applied in an analogous factual context, but the principles underlying the Stabilization Doctrine certainly do apply. And that underlying principle is that an aggrieved party, a party aggrieved by a taking, need not resort to piecemeal litigation if the scope of the taking is in flux or is expanding over time. And that's precisely what's happening with the Midview Exchange because it's a direct result of the United States' mismanagement of the Uinta Indian Irrigation Project and project lands through these non-accessible designations. Does the statute have a non-takings Midview Exchange claim? I know there's a lot of claims here, but is there one that's not a takings claim, maybe a breach of contract claim? Yes, Your Honor, we do. And is the statute of limitations answer the same for that non-takings claim? Is it the Stabilization Doctrine that saves it? Well, for a breach of trust, it would be a continuing obligation, so a continuing claim type of theory in which because there's an ongoing, the ongoing nature of the trust duty, it's never been divested or relieved from the United States' plate of duties, so to speak. That every day, every instance in which this ongoing duty is being breached and not being rectified, that gives rise to a new claim. So we can go back, in order to put it within the statute of limitations window, you can go back six years to when the case was filed or however the court chooses to engage in that analysis. But that would be the overarching theory as it pertains to a breach of contract or a breach of trust case specific to the Midview Exchange. And what is the breach of trust or breach of contract with respect to the Midview Exchange agreement? Is that not putting this structure into trust? That's correct. That's one of them, Your Honor, is failure to finalize its obligation and complete its obligation to take that Midview property into trust and to provide… And what beyond that? What beyond that? As far as a breach of trust, there was… Or a breach of contract. Or a breach of… Well, that would be the extent of the breach of contract, I believe. But as far as breach of trust, there's in addition a claim that the United States ignored the limitations under the Indian Non-Intercourse Act to transfer Indian property rights and essentially engage in a self-dealing transaction in which what their tribe is returning for the transfer of its senior priority Indian reserve water rights is increasingly diminutive based on the United States' own negligence in failing to provide additional water to the tribe or adequately operate and manage the Uintah Indian Irrigation Project. So the disparity between what was given to the tribe in exchange for the transfer of its water rights to the BOR… So are all those acts that you just described, are you saying that they're all subject to the stabilization doctrine? Well, no. That would only apply to takings claims. So that would be the claim that the CUPCA, the Central Utah Project Completion Act, constitutes a taking to the extent that it's interpreted and construed to affect a waiver of the tribe's rights to water under the 1965 Deferral Agreement. So that would be the other taking claim to which the stabilization doctrine would apply. And the reason the stabilization doctrine applies in that case is because under that Central Utah Project Completion Act, the intent of that act, and if the act as a whole, not just the title in which the so-called waiver was initiated, was that there would be replacement projects that would essentially substitute for all of these long, long-standing broken promises just to provide storage infrastructure to the tribe, a much-needed storage infrastructure. Does the continuing claims doctrine apply here? It would not be the continuing claims doctrine so much because it's a takings claim, so it doesn't fall back on a continuing trust duty. Rather, it's kind of two sides of the same coin. The stabilization doctrine is based on when the taking becomes final. So if there's a taking and you are promised, per the Federal Circuit case opinion in Applegate, for example, and you're given some kind of representation and you can justifiably rely on that representation, that this taking is going to be mitigated, in this case by a replacement view and a basin replacement projects, as well as the ongoing negotiations of a tribal water compact, and that you can reasonably rely on that to take a position that the scope of the taking is not final. Could we turn for a moment to the deferral agreement? If we read that agreement as imposing duties that were to be completed by 2005, and I know you don't view it as limited that way, but let's assume we do read the agreement as requiring all the acts that the government is obligated to take to be done by 2005. Would you agree that under that construction of the agreement that breach claims are time barred? To the extent, arguendo, that that's correct, that there was a final act that needed to be completed, an obligation that needed to be completed by 2005, then likely it would be time barred. But our position is that that wasn't, that was the initiation of an obligation, not the final date of the obligation. Is there a final act in this case? Is there a time when it can be said there the government has completed everything it said it was going to do? Well, that would be, you know, our argument is that that wasn't set forth in the deferral agreement itself. It simply triggered an obligation starting in 2005 that it would, that the United States would undergo active efforts to, and I'm paraphrasing there, to satisfy all of the tribe's Indian Reserve water rights at that time. And that this was written as sort of a caveat to the Indian unit and the Yupoko unit not being constructed under deferral agreement. So under the law, a common law of contracts that we applied here, it would be what the court deems a reasonable amount of time. And then that would trigger an approval date. It seems to me that one of the rows that you need to hoe in this case, and that is difficult, is that some of these claims appear to have already been settled, even with payment of monies. Can you address that? So you're referring, I believe, Your Honor, to the Title V of the Central Utah Project Completion Act in the 2012 settlement agreement. I'll address each of those quickly. I see I'm over my allotment of time here. Don't worry about that. Okay. Let me wind this up. Okay. Okay. So as it pertains to the 2012 settlement agreement, that was a settlement of a 2006 breach of lawsuit that encompassed both monetary trust assets and non-monetary trust assets. And so a settlement was entered into in 2012 that contained a provision that waived all claims, then known or unknown, based on the mismanagement of non-monetary trust assets, among other things. But now there was a specific carve-out for claims based on water rights, and that was a very, very extensive carve-out, accepting from that waiver, indicating specifically that not only claims but the tribe's Indian Reserve water rights would not be affected at all. And any claims for damages arising from the United States mismanagement of Indian water rights or failure to protect and preserve Indian water rights were also not waived. And also it's important, I think, to point out that this is a separate carve-out, except it's that waiver from an earlier carve-out to that waiver, accepting any claims that arise after the 2012 settlement was executed. So by reading those provisions together, it's important to, and I think correct, to interpret that exception to the waiver as applying to claims related to water rights that are not just accruing after that 2012 date but had already accrued as of that 2012 date. I'm looking at the language that you're citing, and it's at JA272-288, full settlement. This is a settlement provision, and it says in consideration of payment, plaintiff waives, releases, covenants not to sue in any administrative judicial forum on any and all kinds of claims, causes of actions, obligations. That seems like a pretty broad net that's being cast here, and you're tangled up in that. How do you get out of it? That exception. The exception is specifically none of that scope of that waiver is broad, but none of it applies to claims for damages based on water rights. Now, the United States may argue that, well, you're not just talking about water rights, you're talking about non-monetary trust assets such as the Indian Irrigation Project. But because of the acts of the United States to go into court, federal court, in the 19-teens and adjudicate the tribe's Indian Reserve water rights in the Lake Fork and the Uintah River to the USA Indian Irrigation Service so that they could be delivered through the UIIP, the Uintah Indian Irrigation Project, the United States has not only exercised control over tribal water rights through its control of the Indian Irrigation Project, but it has rendered the so-called non-monetary trust asset of the Uintah Indian Irrigation Project inextricably tied to the Indian tribe's adjudicated water rights. And so I think that falls fully within the scope of that exception, even though it deals with a non-monetary so-called trust asset. Okay. My colleagues have any further questions? Thank you. Okay. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Andrew Birney on behalf of the United States. The Court of Federal Claims correctly dismissed plaintiff's complaint. I want to get into a number of things Mr. Holditch said. First, just a couple of preliminary points. I recognize that this is a complicated case with lots of different claims as to which we've asserted several different grounds of dismissal. The Court may find it helpful, if it hasn't seen it already, at appendix 270. There's a visual aid that accompanied our motion to dismiss from the District Court, which I think tracks in helpful fashion all of the various claims and the grounds as to which we've asserted dismissal in our brief as well. So that's the first preliminary point. The second point is that in addition to Judge Hodges' decision dismissing the complaint and Judge Bonilla's decision denying reconsideration, plaintiff's analogous claims have, of course, been the subject of two well-reasoned decisions, the first by Judge Nichols in DDC and the second by Judge Parrish more recently in the District of Utah, which we brought to the Court's attention. We certainly think those decisions are persuasive and the Court should consider them for their persuasive authority as well. Turning first, I want to start with the trust claims where Mr. Holditch started. None of the sources... I think it would be helpful with respect to the trust claims to divide it into two parts, the way we did earlier. One has to do with securing future water for the tribe based, I guess, mostly on the 1899 Act. And then the second issue is the management of the water infrastructure, which I guess depends primarily on the 1906 Act. So... Yes, I think that's right.  It could concern affirmative... The United States has taken insufficient affirmative efforts to secure water for the tribe. Those are precisely the sorts of claims that were considered in the Navajo case where the Supreme Court said there was no affirmative duty, either under the Winters Doctrine. Mr. Holditch relies on the Winters Doctrine. The Winters Doctrine is part of the bundle of rights that attaches to the reservation. It's a property right that when a reservation is established, it includes an implied right to water. But it does not impose an obligation on the United States to affirmatively supply water, let alone the specific obligations asserted in this case. That's what Navajo said. A plaintiff also relies on principles of control. Navajo makes clear that that isn't enough. It's also... I would direct the court to the 2009 decision in the Navajo case where the Supreme Court specifically makes clear that, first, a plaintiff must identify a specific trust duty, and only after they've done so principles of control are relevant to whether that duty is money mandating. Mr. Holditch also said that based on the 1906 Act, those ordinary principles in Mitchell II, like they have to identify a specific trust duty, might not apply. I actually think the Supreme Court in the Navajo case, in footnote 1, very specifically forecloses that claim. What the court said in footnote 1 of the more recent Navajo case is that was an APA case. It said that the Mitchell standard is not just specific to the Tucker Act. It applies in any case where a plaintiff seeks to impose trust obligations on the United States. So the Navajo case may foreclose the future water claims. But what about the management of the existing infrastructure, and why doesn't that fall under White Mountain Apache? Well, so there are two things that Navajo does not consider in the 1899 and 1906 Act. But what we think, and I'll turn to that in a second, but just what we think it does cover, we think it forecloses their claim just based on the existence of winter rights control as well as the treaties... Wait, wait, you're confusing me. I'm trying to separate the two. The winter's claim, and I understand your theory that the Navajo case forecloses that. But I was now asking about the existing infrastructure, the water infrastructure, whether that was placed in trust with the United States. Why don't they have a claim for breach of trust since that, the 1906 Act, seems to create a trust obligation just the way the statute did in the White Mountain Apache? So I'll turn to those statutes. I'll turn to those statutes now. And you're right that those two statutes were not part of the case in Navajo Nation. We acknowledge that. So I'll start with the 1906 Act. The 1906 Act, as Judge Nichols pointed out, in his opinion, does a couple of things. It authorizes construction of the Uinta Irrigation Project, and it contains bear and trust language and a waiver of sovereign immunity. But it does not prescribe any specific duties at all. And the Supreme Court has made clear. And neither did the statute in White Mountain. The difference between the White Mountain Apache case and this one, which makes the White Mountain Apache case an outlier in the decisions, is in that case there was not only the military base and trust, but the government had the exclusive authority to use and occupy that property. That isn't true in this case. The United States does not have exclusive authority to use the project, which anyone can use in compliance with Utah law. The irrigation regulations does not control plaintiffs' right to irrigate their property or use its own water. And aside from White Mountain Apache, so where that leaves us is simply bear and trust language as to a particular asset, which does not distinguish this case, first of all, from Mitchell I, where there was the General Allotment Act provided that lands were to be held in trust for the Indians, or the Hickorya case where there was in trust language with respect to particular tribal funds. What separated White Mountain Apache and what makes it different from this case is the exclusive right to use and occupy the property, which a bear majority of the Supreme Court said supported an inference of trust duties. We don't have that here. And besides, aside from that bear trust. I don't quite understand. You keep saying we don't have that here. In the 1906 Act, it says, provided that such irrigation systems shall be constructed and completed and held and operated and water therefore appropriated under the laws of the state of Utah, and it goes on to say, provided by the law, shall be in, all of that, shall be in the Secretary of Interior, in trust for the Indians. I mean, that's pretty clear. Right. Yeah, that is in trust language, which the Supreme Court has made, which the Supreme Court has made very clear on multiple occasions, and it's not sufficient. Would you say that's a rights-creating or duty-imposing language? No, because I don't, Your Honor, because I think that begs the question of what rights or duties. It doesn't spell out any specific duties. All it says is that it should be constructed. It's also in White Mountain Apache, too. It didn't spell out specifically. And, again, the difference between White Mountain Apache, in this case, is the exclusive right to use and occupy the structure. That's not the case here. Why isn't the language that Judge Raina just read to you the equivalent of saying that the United States has control and obligations with respect to this property? Because the limited control, in this case, simply pertained to the initial construction of the irrigation project. The United States does not have exclusive right to use the project. This is nothing like not just White Mountain Apache Tribe, but also Mitchell, too, where the United States controlled every aspect of forest management. Here, the United States has never recognized a trust duty under its irrigation regulations. They don't have the right to exclusively use the project. It was simply an authorization to construct the project with bare and trust language that is consistently held to be insufficient. It holds it in trust. I mean, I don't think anybody here is – I don't hear a dispute that the government has to get out and do the irrigating themselves. They're holding the water and the lands and the irrigation systems that the government was promised to construct. Those are held in trust for the Indians. Right, as I've said. If that's right, then doesn't that create a duty? No, because for there to be a duty, there has to be specific language setting forth a particular duty. And with respect, Your Honor— There isn't such language in White Mountain Apache. Again, White Mountain Apache, which is an outlier, had to do with the United States' exclusive right to occupy and control the property, and that's just very different than this case. Is your contention that there has to be that specific language coming from the recent Navajo decision in 2023? Not just the Navajo case most recently, but the Supreme Court has been very clear even before that, that neither a bare trust-creating language or control is sufficient. I mean, I think that's driven home most notably in the Navajo case. Has the Supreme Court squared what it said in White Mountain Apache with this requirement for specific trust language, specific duties? I think in White Mountain Apache itself, Justice Souter's opinion is very clear that what set it apart from Mitchell 1 is the exclusive right to occupy and control the property at issue. In Navajo, by contrast, as Justice Kavanaugh's opinion points out, the United States does not have specific duties as to the land, in terms of farming the land or things like that, so it would be anomalous to say that they also have duties with respect to the water rights that run with the land. I'd like to turn to the 1899 statute, if I could. We don't think that creates trust duties, or particularly the trust duties at issue in this case in particular, for a couple reasons. Your Honor, one of the reasons is the one you cited, that as he deemed necessary language, but I think it doesn't confer trust duties for a more fundamental reason than that, which is that if you look at what this statute is doing and what it was intended to accomplish, it's the statute grants rights of way for non-Indians to divert water that would otherwise flow into the tribe's reservation. And what follows after that, which is this paramount language and the duty to prescribe rules and regulations, is a qualification of the rights of way that the statute confers. I think it would be very odd to read an 1899 statute authorizing rights of way and imposing conditions as imposing affirmative obligations on the United States to supply water infrastructure, particularly since this statute was enacted seven years before the Uinta Irrigation Project was even authorized. It now sounds more like perhaps a promise to secure the water rights rather than a creation of a trust corpus and obligations with respect to the management of the trust corpus, right? If I understand the question, Your Honor, I think recognizing water rights in terms of asserting Winters' claims in litigation is fundamentally different than the claims at issue in this case, which encompasses the building of infrastructure and storage to actually bring water to the reservation. Well, that sounds like a promise, perhaps. It sounds like a promise of the government to do something rather than imposing a trust obligation on the management of particular assets. Well, I think the promise, though, in the 1899 Act was that in granting rights of way is subject to that it would not interfere with the tribe's water rights. It's not a freestanding promise to build water infrastructure and water storage. I understand, but even if it were a promise, that doesn't create a trust. I would certainly agree with that as well, Your Honor. May we turn to the... I'm sorry. Go ahead. Maybe not a promise, but certainly a duty is set out in the 1899 Act. It says, and this shall be the duty of the Secretary of Interior to prescribe such rules and regulations deemed necessary to secure to the Indians the quantity of water needed for their present and prospective wants and to otherwise protect the rights and interests of Indians and the Indian service. That dovetails with the Paramount language that's a little bit further up under that provision. And it also dovetails to, let's say, the 1906 Act. So, Your Honor, for two reasons, I don't think that language supports the duties and issues. It says it's creating a duty. Then it says what the duty is. It goes from one, two, three, describing what the duty is. Right, so two reasons that can't encompass the sorts of claims they're asserting here. And I think they're textually, and I think they're related. Well, first of all, are you saying that it does not create a duty? The duty... Do you concede that it creates a duty? I just want to be very precise about what duty. The duty it confers... The duties that are enumerated in the language here. Right, but the duty it confers is to not grant rights of way that interfere with the water rights. The duty to prescribe rules and regulations is not an affirmative promise to construct water infrastructure or water storage, particularly when you look at the context of this act, which, again, wasn't intended as a conferral of rights at all. It was intended to authorize the construction of rights of way. I think you have to read that language in light of what the statute is doing. But the second point, again, is that a duty to prescribe rules and regulations is very different than a duty to construct particular irrigation and storage projects, which is, again, it would be very odd if the 1899 Act... You're avoiding that it not only creates an obligation to elaborate regulations and rules, but it tells what those rules are to address. It says, to secure to the Indians the quantity of water needed for their present and prospective wants and to otherwise protect the rights and interests of the Indians and Indian servants. Right, and I'm sorry if I'm... And I hope I'm not just repeating myself, Your Honor, but... You're reading something back to me that I don't see. Well, no, so I'll just address the language. First of all... You seem to have an understanding of what this means. It's much different than what the actual words say. I don't think... Well, let me focus on the words. I mean, rules and regulation, prescribing rules and regulations is different than constructing... How about to secure to the Indians the quality of water? Right, so that clause of the statute says that granting the rights of way shall be subject to the paramount rights of the Indians, and that is what this statute is doing. As Judge Nichols and Judge Parrish found, it is a limitation on the authority to confer, and it's not an affirmative duty to construct a water infrastructure and storage, and, again, it would be very odd if Congress had done that in 1899, which is before the Uinta Irrigation Project was even authorized. I'd like to turn... I'm sorry, Your Honor. I think you wanted to turn to another... There's a mid-view exchange agreement claim and the exception for water and other related rights... Right. ...which they say bars your argument that there was a settlement that forecloses that claim. So I want to be clear. There's two claims based on the mid-view exchange. There's a takings claim and a breach-of-contract claim. The takings claim, Claim 10, plainly accrued in 1967 with the execution of the agreement. With respect to the... The Court of Federal Claims went on the settlement. The Court of Claims went on the settlement for Claim 11, which is the breach-of-contract action. So I just resist the takings document just to complete the thought on the... So just to be clear, you're not arguing that the 2012 agreement settled the takings claim? No. I don't... I would have to check, but I think the takings claim... The takings claim is just that it's time-hard, which it is. And Mr. Holditch invoked the Stabilization Doctrine. That doesn't apply here for two reasons. First of all, as I think Judge Stark pointed out, this Court has been very clear that the Stabilization Doctrine is essentially limited to the types of flooding and erosion cases from which Dickinson originated. But even if the Stabilization Doctrine did apply here, it only applies for the period in which it was uncertain whether the alleged taking was permanent, not for damages to be ascertained. The permanence of any claim based on the Midview Exchange was apparent in 1967. Plaintiffs invoked these subsequent acts of deeming certain land non-assessable, which they said widened the gap between what they received and what they gave back in exchange. But that is at most a claim for damages. Even if the Stabilization Doctrine applies in the first place. So that's the takings claim. As to Claim 11, I just want to be clear about this. Plaintiffs allege that they learned that the Midview property had not been transferred into trust in 2016. So based on that representation in the complaint, we have not contended that it's time-barred. I think if that claim went back, we'd certainly have an argument that they at least should have realized that sooner. But that's not part of our claim in this case. Rather, our argument as to that claim is twofold. First of all, we don't think anything in the Midview Exchange Agreement required formal transfer of that property into trust. That is not an issue addressed by the Court of Federal Claims. That is not an issue addressed by the Court of Federal Claims, but it's a legal question that we've briefed. We think if the Court disagrees with our contention at the settlement, we think the Court certainly has discretion to reach that issue here and should reach it. But as to the settlement agreement, the settlement agreement broadly settles all claims stemming from the Department of Interior's alleged mismanagement and accounting of plaintiffs' non-monetary trust that relate to a mismanagement of non-monetary trust assets. A claim that the Midview Exchange was an asset that should have been transferred into trust is plainly a claim that at least relates to the management of non-monetary trust assets, particularly when you look... The water exception. Right. The water exception, acquire and enforce water rights, would be things like diverting plaintiffs' water to other non-senior users, not asserting plaintiffs' winter rights in state water rights adjudications. It does not encompass claims concerning the failure to transfer the Midview property into trust, which is a non-monetary trust asset. So that's as to that claim, but we also just think more fundamentally that in addition to being foreclosed by the settlement agreement, which is what Judge Hodge has found, it also fails at the outset because there was no breach of contract obligation in the first place. I say I'm well over my time. I was going to address briefly the claims based on Kupka and the deferral. So any claim based on the deferral agreement is plainly time-barred. First of all, the complaint makes clear at pages 148 to 50 of the appendix that plaintiffs knew well in advance of 1992 that these units would not be built, but also Kupka extinguished plaintiffs' rights under the deferral agreement. That's the fundamental point. The arguments plaintiffs make in response that that extinguishment was contingent on their ratifying a compact is plainly incorrect as a matter of text. As Judge Parrish found in the District of Utah decision, nothing in Section 507 supports that. As to the replacement projects, as we point out in our brief, the replacement projects were authorized, not required, in an entirely different portion of Kupka. They weren't tied to the compensation scheme in Kupka in any way, so the notion that plaintiffs could just wait to see if the replacement systems were built to their satisfaction, I think, has no logical support, and it's also clear that they knew well before 2012 that those systems would not be built to their satisfaction in any event. I think we're about out of time, most of my colleagues. Thank you very much. We'd ask the CFC that dismissal be affirmed. Mr. Holditch, you have a couple of minutes. Thank you, Your Honors. I want to use my rebuttal time just to address a couple of the arguments that were made by the appellee, first pertaining to the 1899 Act, and what was argued just now is that the 1899 Act was limited to a granting of rights of way on Indian lands, what became the Uintah and Hauri Reservation, but that's only one provision of that Act, and it wasn't a granting of rights of ways. It was a conditional authority on the Secretary to grant rights of ways, subject to the paramount rights of the tribe to the water of that reservation, and then a separate provision provided specifically that it shall be the duty to secure and protect the water right, the quantity of water necessary to meet the present and future needs of the tribe. What about the supposed oddity of that being taken on seven years before the 1906 project? I don't see an oddity there because the Uintah Indian Irrigation Project did not create Indian reserve water rights. In fact, the Winters decision didn't create Indian reserve water rights, and not even the establishment of the reservation created Indian water rights. They're called reserved water rights because they're reserved from a session of lands and water rights that had been used by the tribe since time immemorial. The Winters Doctrine. The Winters Doctrine. The Winters Doctrine is what affirmed that concept, that principle, that even though reservations were established often by treaty or executive order without reference to water, of course it follows common sense and the need to sustain a permanent homeland on the reservation to reserve water rights appurtenant to those reservation lands. I also want to quickly address the statement made by Apelli that the 1906 Act doesn't establish a specific duty or the level of specificity required What Apelli is asking for is a level of specificity that isn't required under the Mitchell II standard for the sheer purpose of determining whether there exists an enforceable money-mandating fiduciary duty for the purpose of going into the next step of the analysis. That's illustrated in the White Mountain Apache case, of course, in which, as your honors correctly pointed out, there is no specific duty spelled out in the statute, the 1960 Act. The difference that the Apelli has directed the court toward is language that doesn't exist in the 1960 Act supposedly giving exclusive authority of the United States over the use and occupation of that trust property. There's nothing in that 1960 Act, I'm aware of, that gives exclusive authority to the United States. What it does do is it gives discretionary authority on the United States to utilize that trust property for certain specific purposes. That's precisely what happened analogously in the 1906 Act by assuming control and administration, operation, and maintenance of the Uinta Indian Irrigation Project. I think we're about out of time. Are there other questions? Thank you. Thank you. I think both counsel's cases submitted.